**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | **No. 21-CR-00284 (JDB)** |
| **JAMES KYLE BELL,** | |
| **Defendant.** | **Sentencing: December 3, 2021** |

<u>**UNITED STATES'S MEMORANDUM IN AID OF SENTENCING**</u>

When the United States faced the challenges of a presidential election and the terror of a

global pandemic, the defendant seized the opportunity to cheat American voters and taxpayers.

The defendant created scam political action committees ("PACs") which purported to raise funds

in support of both major presidential candidates but, in fact, did nothing to support those

candidates.  And the defendant used multiple shell companies to seek millions of dollars in

government-backed loans based on a superabundance of lies—his companies, in fact, had no

employees, no business operations, and no need for the government's assistance during the

pandemic.  Given the nature and seriousness of the defendant's offense, the government requests

that the Court sentence the defendant to a period of incarceration consistent with the agreed-upon

guideline range.  Such a sentence is also warranted in light of the sentencing factors outlined in

18 U.S.C. § 3553(a).

**BACKGROUND**

The defendant's scheme revolved around two scam PACs and five separate shell

companies. (Dkt. 5 ¶¶ 1-2.)[1] First, the defendant registered a PAC called the Keep America

---

[1] "Dkt." refers to the docket entries in this case.  "PSR" refers to the Presentence Investigation Report.

Great Committee ("KAGC") with the Federal Election Commission ("FEC") in Washington, D.C.  (Dkt. 5 ¶ 3.)  Even though KAGC purported to support the re-election of then-president Donald Trump (Dkt. 5 ¶ 7), the defendant also registered a PAC called the Best Days Lie Ahead Committee ("BDLAC") which supported the election of then-candidate Joseph Biden.  (Dkt. 5 ¶ 19.)  The defendant sought donations nationwide for both PACs using online platforms and email solicitations.[2]  (Dkt. 5 ¶¶ 7-9, 20-22.)  The six shell companies were all registered with the State of Nevada, Division of Corporations: Echo Three LLC, Myson Rules LLC, Red Five LLC, Bella Threads LLC, and 5K Media LLC.[3]

### The Scam PACs

The defendant himself registered KAGC with the FEC on January 7, 2020.  (Dkt. 5 ¶ 3.)  He created two websites that solicited donations to KAGC: keepamericagreatcommittee.com and trump2020maga.com.  As the defendant admitted in entering his guilty plea, much of the content on KAGC's websites was copied without permission from other websites supporting President Trump's reelection—to the point of copying proprietary source code verbatim and pirating copyrighted materials.  (Dkt. 5 ¶ 7.)  The defendant also used an email marketing company to send solicitations to no less than 42,000 recipients.  (Dkt. 5 ¶ 8.)

The defendant has admitted that KAGC's email marketing "contained material misrepresentations."  (Dkt. 5 ¶ 9.)  The marketing materials had "the appearance of solicitations from the Trump Campaign containing the official campaign logo."  (Dkt. 5 ¶ 9.)  And the emails made entirely false promises that "donations will be instantly 5X-MATCHED!"  (Dkt. 5 ¶ 9.)

---

[2] The defendant also registered a PAC called "Red Five," but the government does not believe that the defendant ever used it to raise funds.  (Dkt. 5 ¶ 41.)

[3] The defendant also registered a corporation named "Keep America Great Committee LLC" which he used to open bank accounts to receive donations from KAGC.  (Dkt. 5 ¶ 6-7.)

Based on this false marketing, the defendant received no less than $246,000 on behalf of KAGC between January and October 2020.[4]

At the same time that the defendant was purportedly raising funds to support the president's reelection, the defendant raised thousands of dollars on behalf of BDLAC which supposedly supported the election of Joseph Biden.  (Dkt. 5 ¶ 19.)  The defendant created a website to solicit donations called bestdayslieaheadcommittee.com.  (Dkt. 5 ¶ 20.)  The defendant purchased 33 different advertisements on Google to promote BDLAC at a cost of $22,000.  (Dkt. 5 ¶ 21.)  The defendant has admitted that he raised approximately $100,000 in donations on behalf of BDLAC by using an online portal maintained by another—legitimate— PAC, although he ended up refunding those donations when that PAC removed him from its portal.  (Dkt. 5¶ 22.)

The FEC is the federal agency whose mission is to protect the integrity of the federal campaign finance process by providing transparency and fairly enforcing and administering federal campaign finance laws.  (Dkt. 1 ¶ 1.)  However, during the course of the scheme the defendant repeatedly lied to the FEC.  He told the FEC that KAGC's address was located at 1300 Pennsylvania Avenue NW, Washington, D.C., which it was not (Dkt. 5 ¶ 12); that KAGC used a bank located in New York, which it did not (Dkt. 5 ¶ 12); that KAGC had not refunded any contributions to donors, which was false (Dkt. 5 ¶ 18); that KAGC had received only $28,650 in receipts, while KAGC's bank accounts showed receipts of substantially more (Dkt. 5 ¶ 14-15); and that KAGC, for the July 2020 quarterly reporting period, had only $23,4999 in disbursements, which was far less than the $90,000 in disbursements from KAGC's bank accounts.  (Dkt. 5 ¶ 17.)

---

[4] The government has totaled all of the contributions to KAGC made through two payment processors.

The Fake Companies and PPP Loans

In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act to provide emergency financial assistance to the millions of Americans who suffered the economic effects caused by the COVID-19 pandemic. (Dkt. 1 ¶ 5.) One source of economic relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through the Paycheck Protection Program ("PPP"). (Dkt. 1 ¶ 5.) The supporting documentation requirement was deliberately minimal and required only one years' worth of a company's tax records. If a participating lender approved a PPP loan application, the Small Business Agency ("SBA") would 100% guarantee the value of the loan. (Dkt. 1 ¶ 7.) The amount of money that a business could borrow under the PPP was determined based on the business's average monthly payroll and its number of employees. (Dkt. 1 ¶ 6.)

On five separate occasions during 2020, the defendant submitted PPP loan applications which were riddled with fraudulent statements on behalf of shell companies that he owned or controlled. (Dkt. 5 ¶¶ 23-51.) The defendant applied for a loan on behalf of "Echo Three LLC" and told the lender his company had 83 employees and an annual payroll of over $2.3 million. (Dkt. 5 ¶ 24.) Echo Three LLC's application included a fraudulent IRS Form W-3 which included those numbers. (Dkt. 5 ¶ 24.) In fact, the defendant had at most six employees and never had a payroll over $2 million. (Dkt. 5 ¶ 25.) Nonetheless, the defendant received a PPP loan in the amount of $485,016 for Echo Three LLC which was guaranteed by the taxpayers. (Dkt. 5 ¶ 27.)

The defendant also used his wife's name and signature to apply for a PPP loan for "Myson Rules LLC." (Dkt. 5 ¶ 34.) In the application, the defendant claimed that this company had 74 employees with an annual payroll of $2.3 million. (Dkt. 5 ¶ 34.) The defendant, again, submitted a false IRS Form W-3 in support of the application. (Dkt. ¶ 35.) In fact, Myson Rules never had 74 employees and never had an annual payroll over $2 million. (Dkt. 5 ¶ 35.) Nonetheless, Myson Rules LLC received a government-backed PPP loan in the amount of $492,754 based on these false statements. (Dkt. 5 ¶ 36.)

In approximately April 2020, the defendant applied for a PPP loan for a Nevada company he controlled called "Red Five LLC." (Dkt. 5 ¶ 38.) This application included a completely fake IRS Form 940 employer tax return for year 2019 in which the defendant claimed the company had an annual payroll of $490,500. (Dkt. 5 ¶ 38.) In fact, Red Five LLC had no payroll expenditures at all—let alone a payroll of almost $500,000. (Dkt. 5 ¶ 39.) The defendant received a loan of $112,187 through the PPP for Red Five LLC.

The defendant submitted a fourth application for PPP funding on behalf of "Bella Threads LLC," using his wife's name. (Dkt. 5 ¶¶ 42-43.) In the company's application, the defendant represented that the company had an annual payroll of $239,423. (Dkt. 5 ¶¶ 43-44.) That payroll amount was false but, nonetheless, the defendant received a PPP loan in the amount of $49,879 for Bella Threads LLC. (Dkt. 5 ¶¶ 44-45.)

Finally, in May 2020, the defendant applied for a PPP loan for "5K Media LLC" which he claimed had 41 employees with an annual payroll of $2.5 million. (Dkt. 5 ¶ 46-47.) In fact, 5K Media never had more than six employees and never had a payroll approaching that amount. (Dkt. 5 ¶ 48.) The defendant requested a PPP loan in the amount of $521,625. (Dkt. 5¶ 47.)

However, the defendant contacted his lender and withdrew the application for 5K Media LLC before the loan could be funded.  (Dkt. 5 ¶ 50-51.)

<p style="text-align:center">Guilty Plea</p>

The defendant agreed to enter a pre-indictment plea to an Information charging him with one count of Wire Fraud in violation of 18 U.S.C. § 1343.  (PSR ¶ 4.)  In entering a plea to that count, the defendant admitted that he had created and operated the two scam PACs at issue—KAGC and BDLAC—and that he had submitted fraudulent PPP loan applications for five different companies.  (PSR ¶¶ 12-13.)  The defendant further admitted that he co-mingled PPP loan proceeds with donations to his scam PACs, and diverted funds for his personal benefit.  (Dkt. 5 ¶ 28-32.)  The Information to which the defendant pleaded guilty identified eight different instances in which the defendant used the interstate wires to transmit information to the FEC and the SBA in furtherance of his scheme.  (Dkt. 1 ¶ 23.)

For purposes of the sentencing guidelines, the parties have agreed that the actual and intended loss amount in this case is over $1.5 million.  (Dkt. 4 at 2.)  That loss amount is calculated as follows:

| | |
|---|---:|
| Total Contributions to KAGC (PSR ¶ 64) | $246,751.45 |
| Total Contributions to BDLAC (PSR ¶ 33) | $100,000.00 |
| PPP Loan to Echo Three LLC (PSR ¶ 38) | $485,016.00 |
| PPP Loan to Myson Rules LLC (PSR ¶ 47) | $492,754.00 |
| PPP Loan to Red Five LLC (PSR ¶ 51) | $112,187.00 |
| PPP Loan to Bella Threads LLC (PSR ¶ 56) | $49,879.00 |
| PPP Loan to 5K Media LLC (PSR ¶ 58) | $521,625.00 |
| TOTAL | $2,008,212.45 |

The provisions of the Mandatory Victim Restitution Act apply in this case.  (PSR ¶ 64.)  And, although the parties have not stipulated to a restitution amount, the plea agreement provides that

<p style="text-align:center">6</p>

the Court will consider whether, and in what amount, mandatory restitution applies.  (Dkt. 4 at 7.)

As part of his plea agreement, the defendant has agreed to forfeit his criminal proceeds to the government.  (PSR ¶ 147.)  The plea agreement reflects an agreement by the parties that the actual proceeds of the defendant's scheme total $1,386,588.25.[5]  The defendant will forfeit $4,900 which is currently being held in trust by his counsel.  (Dkt. 4 at 9.)  The defendant will also forfeit $519,128.06 in funds that were seized by the government as criminal proceeds from bank accounts that the defendant controlled. (Dkt. 4 at 9.)  And the defendant has agreed to the entry of a forfeiture money judgment of  $862,560.19 which reflects the remaining amount of proceeds.  (Dkt. 4 at 9; PSR ¶ 147.)

## SENTENCING GUIDELINES

As the Court is well aware, although the U.S. Sentencing Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 261 (2005).  Thus, at sentencing a court "must first calculate the Guidelines range applicable to the defendant. *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see also Gall v. United States*, 552 U.S. 38, 49-50 (2007).  Pursuant to the plea agreement in this matter, the parties have agreed that the following sentencing guidelines should apply:

| U.S.S.G. Provision | Description | Levels |
|---|---|---|
| § 2B1.1(a)(1) | Base offense level | 7 |
| § 2B1.1(b)(1) | Actual and intended loss more than $1.5 million | +16 |

---

[5] This amount is the sum total of the following: all donations to KAGC ($246,751.45), the PPP loan to Echo Three LLC ($485,016), the PPP loan to Myson Rules LLC ($492,754), the PPP loan to Red Five LLC ($112,187), and the PPP loan to Bella Threads LLC ($49,879).  The proceeds of the scheme do not include the amounts refunded to BDLAC donors and the PPP loan application that the defendant made and withdrew on behalf of 5K Media LLC—although those amount are properly included in the intended loss for purposes of the sentencing guidelines.

| U.S.S.G. Provision | Description | Levels |
|---|---|---|
| § 2B1.1(b)(2)(A) | Offense involved more than ten victims or was committed through mass marketing | +2 |
| § 2B1.1(b)(9) | Misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization | +2 |
| § 2B1.1(b)(10) | Offense involved sophisticated means | +2 |
| § 2B1.1(b)(17)(A) | Defendant derived gross receipts over $1 million from one or more financial institutions | +2 |

(PSR ¶ 146.)  These guidelines yield an adjusted offense level of 31.  (PSR ¶ 78).  In the plea agreement, the government agreed that the defendant should receive a two-point reduction for acceptance of responsibility.  (PSR ¶ 80.)  The government also believes that the defendant should receive an additional one-point reduction under the guidelines for providing the Court and the government with timely notice prior to indictment of his intention to enter a guilty plea. (PSR ¶ 81.)  The probation office has correctly calculated that the resulting total offense level is 28.  (PSR ¶ 82.)

The government at this time has no reason to dispute the probation office's calculation that the defendant's criminal history score falls in Category I.  (PSR ¶ 85.)  With an Offense Level of 28 and a Criminal History of Category I, the guidelines recommend a sentence of 78 months to 97 months of incarceration.  (PSR ¶ 146.)

**STATUTORY FACTORS**

As the Court is also well aware, after calculating the applicable Guidelines range, a sentencing court must then consider that range as well as the sentencing factors set forth in 18 U.S.C. § 3553(a) and determine a sentence that is appropriate and reasonable for the individual defendant.  *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). With respect to that section's enumerated factors, of particular relevance here are the "nature and circumstances of the offense," the need for the sentence "to reflect the

seriousness of the offense" and provide "just punishment," "the history and characteristics of the defendant," the need "to promote respect for the law," the need to "avoid unwarranted sentence disparities," and the need for the sentence "to afford adequate deterrence to criminal conduct." 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), (a)(2)(B), (a)(6), (a)(7).

<u>Nature and Circumstances of the Offense, and its Seriousness</u>

The defendant's crime was serious by any measure. At a time when the United States was acutely focused on a presidential election and amid a global pandemic that has killed over 700,000 people in America, the defendant decided to take advantage of an opportunity for profit by casting a web of falsehoods. The defendant's PACs were nothing more than a sophisticated confidence trick that cheated only people who had hoped to participate in our electoral process through campaign donations—a sacred privilege afforded to every American. The defendant targeted no less than 42,000 people with email messages promoting his scam. (PSR ¶ 19.) KAGC received donations from at least 3,400 victims who gave less than $75 on average. Although financial losses to each individual donor might appear quite modest, those donations reflect each victim's passionate belief that their money – however modest – could be used to benefit a greater cause. The defendant targeted and exploited these victims. Instead of using donations to KAGC to support the re-election of Donald Trump, the defendant diverted the funds for his own use and benefit. And the defendant cynically also targeted victims who intended to give money to support the candidacy of Donald Trump's primary rival, Joseph Biden.

Crimes like these breed distrust of our democratic institutions. When victims lose their political contributions, they lose their voice in our public discourse. Indeed, it is for this precise reason that our legal system recognizes that such contributions are tantamount to

protected political speech.  *See McCutcheon v. FEC*, 527 U.S. 185 (2014).  When voters

believe that they have no voice in a political system, powerlessness and alienation follows.

These serious harms reach far beyond the low-dollar loss amounts incurred by each victim.

Additionally, at the same time that the defendant was operating his scam PACs, he

further capitalized on the moment to dupe multiple lenders into giving him $1.1 million of

taxpayer-backed PPP loans.  The CARES Act designed the PPP to provide funds quickly and

easily to qualifying individuals.  Congress wanted to help small business owners and their

employees whose livelihoods were jeopardized by the unprecedented crisis facing Americans.

The defendant abused this process not just once; but on five separate occasions.  He

submitted completely fake tax and payroll documents for his five different shell companies.

The defendant lied about the number of employees for each company.  He lied about the

businesses' annual payroll.  And, because PPP funds were limited (and ran out), the defendant

undoubtedly prevented other legitimate applicants from receiving funding.

These considerations weigh in favor of a substantial period of incarceration.

### History and Characteristics of the Defendant

 The defendant agreed to plead guilty without arrest and without indictment.  Thus, he

deserves credit for accepting responsibility early and saving the government considerable

resources in preparing this case for presentation to a grand jury and a trial.  The sentence

recommended by the United States reflects such acceptance because it incorporates a downward

adjustment by three levels for acceptance of responsibility pursuant U.S.S.G. § 3E1.1.

However, it is worth mention that the conduct described in the Statement of Offense does

not reflect the totality of instances in which the defendant sought to take advantage of the

taxpayers during the pandemic.  In addition to committing PPP loan fraud, the defendant also

submitted applications to the SBA for the COVID-19 Economic Injury Disaster Loan ("EIDL")

program on behalf of shell companies that he controlled.

| Application Date | Company Name | DBA Name | Applicant | Loan Amount |
|---|---|---|---|---|
| March 30, 2020 | Red Five Inc. | Red Five Inc. | James Bell | $418,000 |
| July 1, 2020 | Red Five Inc. | Red Five LLC | James Bell | $130,000 |
| July 5, 2020 | Nailed It LLC | Nailed It LLC | James Bell | $119,720 |

Although none of these loans was ever funded by the SBA, they shed further light on the

defendant's intention to cheat the taxpayers and to profit from the government's response to the

pandemic.

Additionally, since entering his guilty plea in May, the defendant has failed fully to

respond to the government's inquiries regarding his cryptocurrency holdings.  In his interview

with the probation office, the defendant claimed that he and his wife had no more than $3,000 in

Bitcoin holdings.  (PSR ¶ 132.)  However, as the government noted in its response to the PSR,

the government is aware that the defendant invested no less than $72,000 in cryptocurrency

between March and May 2020 using the currency exchange Coinbase.  (PSR at 30.)  The

defendant's investments with Coinbase came directly from one of the defendant's bank accounts

that he used to receive the  proceeds of the scheme in this case.  The cryptocurrency that the

defendant says he purchased, Bitcoin, has increased in value by over 300% since June 2020.

On September 2, 2021, the government asked that the defendant provide an accounting of

his cryptocurrency holdings, along with the key codes and wallet identifiers that he has used to

trade cryptocurrency.  At the request of defense counsel, the government has produced copies of

the defendant's bank records that show he invested $72,000 of his criminal proceeds in cryptocurrency.[6]   However, to date, the defendant has provided the government with nothing in response—not even a proffer.

<div align="center">

Promotion of Respect for the Law,
General Deterrence, and Avoiding Disparities
</div>

The government's recommended sentence in this case—incarceration at the low end of the agreed-upon guideline range—will promote respect for the law and provide for general deterrence.   At their core, the defendant's scam PACs were a highly sophisticated form of consumer fraud perpetrated using the internet.   The FBI's Internet Crime Complaint Center ("IC3") has reported that during 2019 it received more than 400,000 complaints of internet fraud.   IC3 also reports that these scams caused reported losses of more than $3.5 billion.[7] Notwithstanding the efforts of law enforcement, only a fraction of these schemes result in successful prosecution.   Accordingly, the need for general deterrence for internet fraud schemes is critical.

Additionally, this case involves fraud on a government program that was motivated by greed at a time when millions of Americans were suffering from the economic impact of a global pandemic.   As the pandemic spread, so too did fraud related to the PPP program and other programs designed to provide critical economic assistance.   Actors like the defendant who seek to defraud these programs not only drain the program of limited funding; they make it more difficult for administrators of government and other relief programs to get aid to

---

[6] The transfers were made from the defendant's Bank of America account x2519 which the defendant has admitted he used to receive PPP loan funds.  (Dkt. 5 ¶¶ 37, 45.)  The transfers to Coinbase were as follows: March 23 ($250), March 24 ($1,000), March 24 ($30), April 20 ($315), April 22 ($7,000), April 30 ($1,000), April 30 ($9,000), May 4 ($13,000), May 5 ($635), May 6 ($767), and May 29 ($40,000).  The total of these Bitcoin purchases is $72,997.
[7] Federal Bureau of Investigation, 2019 Internet Crime Report at 12 (available athttps://ic3.gov/Media/PDF/AnnualReport/2019_IC3Report.pdf).

individuals that qualify for and need it.  The government's recommended sentence of

incarceration in this case is thus appropriate to send a message to other offenders that there are

serious consequences for defrauding government pandemic relief programs.

The government's recommended sentence will not create an unwarranted sentencing

disparity.  This case represents a unique instance in which the defendant's scheme involves

both the operation of scam PACs and the fraudulent receipt of large amounts of PPP loan

funds.  Although a relatively small number of PPP loan defendants have been sentenced in

cases nationwide, the judges of other districts have not hesitated to sentence such defendants to

substantial terms of imprisonment that are consistent with the guideline range in those cases.

*See, e.g., United States v. David Hines*, No. 21-CR-20011 (S.D. Fla. May 12, 2021) (78 months

of incarceration; guideline range of 63-78 months); *United States v. Ganell Tubbs*, No. 20-CR-

193 (E.D. Ark. March 15, 2021) (41 months of incarceration; guideline range of 41-51

months); *United States v. Benjamin Rafael*, No. 21-CR-20161 (S.D. Fla. July 14, 2021) (18

months of incarceration; guideline range of 12-18 months).  At the same time, the handful of

judges who have sentenced scam PAC defendants have uniformly imposed substantial

incarceration.  *See, e.g., United States v. Kelley Rogers*, No. 19-CR-270 (E.D. Va. Jan 17,

2020) (36 months of incarceration); *United States v. Tierney*, No. 18-CR-804 (S.D.N.Y. March

15, 2019 (24 months of incarceration); *United States v. Harold R. Taub*, No. 19-CR-804 (July

24, 2019) (36 months of incarceration).[8]  Consequently, the government's recommended

sentence in this case would be in line with the types of sentences that courts have found

appropriate in both scam PAC and PPP loan fraud matters.

---

[8] Although the sentences in each of these scam PAC cases appear to have varied from the guideline range, none of
these defendants also faced sentencing for financial institution fraud or defrauding the government as does Mr. Bell.
Nonetheless, courts have sent a clear message that scams targeting donors to political causes—even standing
alone—should be met with years of imprisonment.

**CONCLUSION**

The crime here is uniquely egregious. The defendant conned voters seeking to participate in our democratic process while simultaneously stealing government resources earmarked for pandemic relief. For all of the foregoing reasons, the government submits that an appropriate sentence in this case is for the defendant to serve a period of incarceration at the bottom of the guideline range, and that the Court also enter orders of restitution and forfeiture consistent with the plea agreement.

<div style="margin-left: 45%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By: _____
JOHN W. BORCHERT (Bar No. 472824)
ELIZABETH A. ALOI
Assistant United States Attorneys
Fraud & Public Corruption Section
555 Fourth Street, NW
Washington, D.C.  20530
(202) 252-7679

</div>

November 23, 2021

CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of November 2021, I caused a copy of the foregoing

to be served on counsel for the defendant via the court's ECF system.


_____
JOHN W. BORCHERT
Assistant United States Attorney